UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | : CRIMINAL NO. 3:16-CR-237 (SRU) |
| vs. | : |
| | : August 21, 2017 |
| ARTURO CASTRO | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

In anticipation of sentencing in this matter, Defendant Mr. Arturo Castro submits the following sentencing memorandum. For the reasons that follow, Defendant submits that the Court should impose a sentence of ten years' imprisonment, the mandatory minimum sentence in this case.

### FACTUAL BACKGROUND

For the past quarter century, Arturo Castro, a citizen of Mexico, has made it his life's work not merely to integrate into American society, but to build and support the sort of cross-cultural connections that make America the melting pot community that, at its best, this country strives to be.

In 1989, at age 25 Mr. Castro left Cancun for Chicago. He left for love, following Bonalynn Wallach, whom he would later marry. He left behind his first entrepreneurial venture, an ice cream business in Cancun's tourist district, which he had opened after completing a degree in hospitality management. He did not, however, leave behind the work ethic or entrepreneurial spirit that had led to this first endeavor. As Ms Wallach writes of Arturo's coming to America:

> Arturo's commitment to leaving his family and country was significant and challenging vision of starting his own company was key in understanding Arturo's desire to work hard and succeed. He developed a translation business that in its infancy was targeted to local restaurants and hotels with a need for assistance with non-English speaking employees. As his client base grew, he approached larger organizations such as Marriott Corporation to teach Total Quality Management (TQM) seminars and workshops all over the globe. This

story of success can only be achieved by individuals with particular characteristics, as possessed by Arturo.

**Exhibit 1**.

Tellingly, however, what made Arturo successful was not simply ambition or drive. Rather, he succeeded in building a consulting service that focused on helping English-speaking corporate management and Spanish-speaking staff communicate and work together effectively because he himself was willing and able to make human connections across class and socio-linguistic barriers. Bonalynn continues:

> Arturo's ability to communicate with persons from diverse backgrounds; both socioeconomic and ethnic, demonstrates his keen nature of compassion for all. He can communicate with the local janitorial team in the same way that he communicates with the Mayor of Chicago, the classroom teacher or the busboy in the restaurant. All of these individuals in Arturo's mind are human beings worthy and deserving, and one is not better than the other. He appreciates people for who they are and celebrates their differences. He has never shown anything other than such to friends, family and those around him. This is just one example of the warmth and respect he has for all.

*Id*.

Another example of the warmth and respect to which Bonalynn refers comes from a former assistant of Arturo's who observed him working in his most recent professional capacity as the curriculum designer and coordinator for community outreach programs operated by UNAM Chicago, a satellite branch of a major Mexican university. She writes:

> One of my tasks was to collect the students' opinions about Arturo in a computer system. This was at least 3 times a week. And all the reviews about how the students felt about the course and the teacher were very good. In fact, I could see how the community of Mexican migrants got along with him by their way of being. He was always supporting them with their schedules, explaining issues with a lot of patience. He had to deal with some very humble and hard working people. He brought a tremendous amount of energy and enthusiasm to his job.

**Exhibit 2**.

2

These same qualities also made Arturo the "perfect fit" for the job "when the Mayor of Chicago requested a Spanish tutor so that he could communicate with the parents of Latino victims of violence," as a client and colleague recalls in the letter attached as **Exhibit 3**. Succinctly capturing Arturo's nature, another former client—and now a friend of 26 years—describes Arturo's "genuine concern for others" in the letter attached as **Exhibit 4**.

For all of his professional commitments, the paramount object of Arturo's concern and compassion for others has been his family, and particularly his children. Arturo and Bonalynn divorced in 2001, but Bonalynn's letter, written 16 years later, is not a recollection of a faded and broken past. Instead, Bonalynn presents a living picture of Arturo built upon a long history of promises kept and relationships nurtured even after their own marriage ended:

> As a family- man, father, son, brother, husband, ex-husband he has and will be there for all. No matter what was needed of him in the years since we have been divorced from 2001-present, he has gone above and beyond to love and parent his children. Whether that means delivering a school required item at midnight to my kids or purchasing groceries and leaving them in our kitchen, so upon our arrival back from a trip we were well stocked. . . . From the day we were divorced, Arturo has rarely missed an evening goodnight call to his girls[.]

**Exhibit 1**. Bonalynn's sister, describing Arturo as "one of the most exceptional present Father's I have known including my own and the Father of my children," likewise recounts:

> I have listened and watched his responsible parenting for decades. Geography aside, work aside, his children have come first. It is beyond exceptional to watch. Similarly when we would travel as families, Arturo would reign in and never hesitate to jump at the task that some would often see as domestic or "the woman's role". . . . my sister often needed to be on the train early to get to work before the financial markets opened. Given their amicable co parenting relationship, as Bonalynn walked out, Arturo would walk in, sometimes 6:30 or 7:00 am while the girls were nearly stretching to take over the role of preparing breakfast and getting them ready for school.

**Exhibit 5**. Arturo maintained these commitments even while building a new life with his second wife and their own child.

3

As a parent always ready with both moral and material support, whatever the hour, Arturo has been the opposite of his own father. Though a successful enough businessman to have provided his family with a middle-class lifestyle, Arturo's father was a chronic alcoholic—and so both his father and his father's wages departed every evening to the bar. PSR ¶ 65. His father's dereliction of his parental role meant sometimes there was no money for food or to pay the electric bill—and it also meant that Arturo grew up without a stable father-figure as a role model. Psychological Evaluation, filed separately under seal as **Exhibit 6**, at 2.

Nor has Arturo's dedication to family been limited to his own children. As Arturo's younger brother writes, "[w]e lost our father over 20 years ago and since then Arturo has been like a father to me. My mentor. I am what I am thanks to him. I respect him and love him since I remember." **Exhibit 7**. His youngest sister likewise states plainly, "Arturo for me he has being like a father." **Exhibit 8**. Another of his sisters writes in **Exhibit 9** that Arturo "was always willing to help us in what my family might need, always worried about my children's studies . . . . I could share with you many beautiful experiences that I have lived with him, but there are certainly no words that can describe how excellent an individual he is."

Additional letters of support from friends and family are collected as **Exhibit 9**.

**MR. CASTRO'S STATISTICAL LIKELIHOOD OF RECIDIVISM IS EXTREMELY LOW—EVEN RELATIVE TO OTHERS IN CRIMINAL HISTORY CATEGORY I.**

"Minimal or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism. *United States v. Germosen*, 473 F.Supp.2d 221, 227 (D. Mass. Jan. 18, 2007) (Gertner, J.). (citing United States Sentencing Commission, A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient

Factor Score, 15 (Jan. 4, 2005).[1] The United States Sentencing Commission has conducted statistical analyses to assess the recidivism rates of defendants based on numerous criteria, including but not limited to criminal history points, over an extended period. The most recent iteration of the Commission's research was released in March of 2016. Recidivism Among Federal Offenders: A Comprehensive Overview (March 2016).[2] The Commission's findings point to the conclusion that Mr. Castro is highly unlikely to recidivate. This empirical evidence, set forth below, suggests that the punishment prescribed by the guidelines based on a Criminal History category of I may consequently be overstated in this case and a sentence within that range may not be consistent with the statutory mandate that the sentence imposed be sufficient but not greater than necessary to meet the goals of a criminal sentence.  See 18 U.S.C. § 3553(a).

Specifically, Criminal History category I, which accounts for those with both 0 and 1 criminal history points, covers individuals with statistically quite different levels of likely recidivism. Individuals with zero criminal history points subsequently are rearrested in 30.2% of cases, while those with I point are rearrested over 50% more often, at 46%. As the Commission reported in a publication earlier this year, this divide between defendants with 1 criminal history point and those with none is not simply a reflection of the broader statistical correlation between greater criminal history and increased recidivism risk. Rather, [t]hese differences within CHC I are substantially larger than the differences within other CHCs." The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders, at 14 (Mar. 2017). Individuals like Mr. Castro who have lived

---

[1] Available at http// www.ussc.gov/publicat/RecidivismSalientFactorCom.pdf ).

[2] Available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf

5

productive adult lives such that they have never sustained a criminal conviction are not merely marginally different from those with modest criminal histories—they stand in a categorically different statistical position. The Guidelines unfortunately do not yet reflect this empirical reality. The sentence in this case should.

On a more individual level, the results of a psychological evaluation conducted by Dr. Wendy Levy indicates that Mr. Castro is unlikely to re-offend. He poses a risk of sex offending that is, in Dr. Levy's assessment "Low to Low-to-moderate."  **Exhibit 6** at 13. Moreover, as Dr. Levy indicates in her report, the limited risk factors that are present in Mr. Castro's may be further reduced through education, including through programs available through the Bureau of Prisons. *Id*.

**SECTION 2G2.1 OF THE SENTENCING GUIDELINES DOES NOT PROPERLY APPLY.**

The offense of conviction in this case is ordinarily governed by U.S.S.G. § 2G1.3. A cross-reference provision in that Guideline, however, provides that:

> If the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, apply § 2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production), if the resulting offense level is greater than that determined above.

U.S.S.G. § 2G1.3(c)(1). The Government and the Presentence Report both assert that this cross-reference applies in the present case. *See* PSR ¶ 49. For the reasons outlined below, it does not.

Commentary to § 2G1.3 indicates that, while this cross-reference "is to be construed broadly," the provision is limited by a requirement that the "sexually explicit conduct" depicted must satisfy the definition of that term as it appears in 18 U.S.C. § 2256(2). U.S.S.G. § 2G1.3 Application Note 5.

Section 2256(2), in turn, defines sexually explicit conduct in this context as "actual or

6

simulated-- (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person . . . ."

As the offense conduct portion of the Presentence Report indicates, although the interactions between Mr. Castro and MV involved the exchange of various videos, none of the videos sent by MV between January 10, 2015, and February 2, 2015, meet the definition set out in § 2256(2). *See* PSR ¶¶ 15 -20.[3] Between February 3rd and 6th of 2015 did MV send a set of videos, at least some of which do satisfy this definition. *See* PSR ¶¶ 24-26, 29. The offense conduct, however, does not indicate that these videos were sent in response to any specific request by Mr. Castro. And while Mr. Castro did respond to these videos on February 7 in a manner that could be interpreted as encouraging further similar material, *see* PSR ¶ 30, MV did not send any additional videos. Consequently, although the evidence shows that Mr. Castro did encourage MV to send him material that was broadly sexual in nature, the facts outlined in the Presentence Report do not show that Mr. Castro specifically prompted the production of materials of the sort described in § 2256(2).

Under U.S.S.G. § 2G1.3(a)(3), the base offense level in this case is 28. After accounting for enhancements based upon the age of the minor (§ 2G1.3(b)(1)), use of a computer (§ 2G1.3(b)(3)), and sexual contact (§ 2G1.3(b)(4)) and a reduction for acceptance of responsibility, the offense level is 31. In light of Mr. Castro's lack of criminal history, this results in a recommended sentence of 108 – 135 months. Because the mandatory minimum sentence in this case is 120 months, however, the recommended Guidelines sentence is 120 - 135 months.

---

[3] PSR ¶ 18 describes a dark photograph. Defendant does not concede that this photograph satisfies § 2256(2).

## THE SENTENCING GUIDELINES PROVIDED BY § 2G2.1 OVERSTATE THE SEVERITY OF THE OFFENSE.

If, contrary to the discussion above, the cross-reference to U.S.S.G. § 2G2.1 were to properly apply, a sentence within the range suggested by this provision would overstate the severity of the offense.

The Second Circuit has recognized that the United States Sentencing Commission's approach to child pornography is "fundamentally different" from its guidance with respect to most other offense and consequently, "unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010). Specifically, the *Dorvee* court explained, "Sentencing Guidelines are typically developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. However, the Commission did not use this empirical approach in formulating the Guidelines for child pornography." *Id*. (citation omitted).

As Judge Pooler articulated in a recent dissent, however, "much of the *Dorvee* court's criticism of the child pornography guidelines applies to the guidelines for production offenses as well. As with the guidelines for trafficking in child pornography found in Section 2G2.2, the Sentencing Commission did not use an empirical approach to develop the production guidelines found in Section 2G2.1. Instead, the Commission has increased the base offense level and added enhancements for production offenses 'usually as a result of congressional directives.'" *United States v. Brown*, 843 F.3d 74, 89 (2d Cir. 2016) (Pooler, J., dissenting). These enhancements include a substantial increase in the recommended sentence because a computer—novel when the enhancement was introduced 20 years ago but now a ubiquitous aspect of daily life—was involved in the offense. Indeed, this "use of a computer" enhancement increases the midpoint of the

recommended Guidelines sentence by <u>over three years</u>.

In this case, not only does the sentencing scheme set forth in § 2G2.1 suffer from the irrationalities that haunt the child pornography guidelines generally, but it also presents a case of the tail wagging the dog. The offense conduct in this case involved communication between Mr. Castro and MV that culminated in Mr. Castro's travelling to Connecticut to engage in illicit sexual activity. The offense is an exceedingly serious one—but it is an offense for which the recommended sentence is consistent with the 10-year sentence proposed by Defendant. Any production of material constituting child pornography was incidental to that offense. That the Guidelines recommend punishing this incidental production more severely than the underlying offense reveals a significant distortion in the Guidelines' approach to child pornography.

**THE FACTORS PROVIDED IN 18 U.S.C. 3553(a) WEIGH IN FAVOR OF A NON-PRISON SENTENCE.**

While the Court is required to consider the range of penalties suggested by the Guidelines in determining the appropriate sentence in a given case, it is not bound by that range. What the Court is bound by is the dictate of 18 U.S.C. § 3553(a) that the Court "shall impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing. As the Second Circuit explained in *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006), the consequence of this provision is that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence. *See id.* at 142 (stating that where a Guidelines sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence). Here, the purposes of sentencing outlined in § 3553(a) are amply satisfied by a sentence of home confinement.

**Mr. Castro's History, Character, and Circumstances Support a Sentence of Not More Than 10 Years.**

As the letters discussed above, over his 53 years Arturo Castro has shown himself time and again to friends, colleagues, and family members to be a man of great energy, commitment, and compassion.

As the offense conduct outlined in the PSR also shows, that same man also committed an offense that seriously undermines the values of family and community that he has worked so hard to advance through his personal and professional life. Mr. Castro recognizes the severity of this betrayal. He writes in the letter attached as **Exhibit 11**:

> I have committed a horrible crime and I take full responsibility for my actions. I feel deeply sorry for the harm I have caused the victim, her parents, her family and her community. No amount of past trauma, unhappy marriages or psychological childhood issues can rightfully justify the seriousness of the crime I have committed.
> I have caused a tremendous amount of hurt, pain, and suffering on the victim and her parents. With my crime, I have compromised the integrity and safety of their own home, their own space, their family safety. I am sorry that my actions have challenged their lives in ways I can only imagine as a father of three young daughters.

In his actions in this case, Mr. Castro lost sight of the core values that he not only believes in, but that he has exemplified. His punishment in this case includes the reality that he will have to live, forever, knowing how deeply he has betrayed what he values. But Mr. Castro has not abandoned or given up those values, and a 10 year sentence will, hopefully, leave him with time in his life to resume the good and productive life he has lived for nearly all of his 53 years.

**A Sentence of 10 Years Achieves Just Punishment.**

By any measure, a decade of life is a severe sanction. By the time he is released from prison, his youngest child will be an adult. He will leave prison, destitute, at an age when his contemporaries are getting ready to contemplate retirement. And he will be 2,000 miles from his home in Chicago, exiled to Mexico for the rest of his life.

10

**A Sentence of 10 Years Will Achieve Ample Deterrence.**

Mr. Castro's conduct in this case was far out of step from how he has lived most of his life. This offense was not the culmination of a pattern of similar conduct, nor was it the start of a course of illicit conduct: records of Mr. Castro's electronic footprint show that he did not engage in similar behavior either before or after the offense in this case occurred in early 2015. Consistent with the isolated nature of this offense, Dr. Levy's report, discussed above, indicates that Mr. Castro is unlikely to re-offend. To the extent that any need for specific deterrence is present here, there is no basis to conclude that a sentence of 10 years will not be more than sufficient to drive home to Mr. Castro the consequences of his action.

With respect to general deterrence, as discussed above there simply is not empirical support for the notion that a prison sentence will deliver greater general deterrence than a relatively milder sentence would. It is the fact of Mr. Castro's punishment, not its magnitude that matters. As a 2012 review of the studies that have examined the deterrent effect of sentence severity concludes, "the vast majority of these comprehensive summaries found no convincing evidence suggesting that harsher sentences deter." Webster, Cheryl Marie, and Anthony N. Doob. "Searching for Sasquatch: Deterrence of crime through sentence severity." *The Oxford Handbook on Sentencing and Corrections* (2012): 173-195, at 176. Recognizing that "effective deterrence arises from certainty, not harshness, of punishment," a decision in the Eastern District of New York sensibly asks whether "our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques." *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) (Weinstein, J.).

**The Court Should Account for Immigration Consequences in Fashioning a Sentence.**

Because of his conduct in this case, Mr. Castro is almost certain to face immediate and permanent banishment from the United States. A sentence of years in prison, that is to say, will only be the start of a lifetime sentence under which Mr. Castro will never be able to step foot on American soil again. When he is released, his older children—whom he has cared for their entire lives—will be at a point in their own lives when they may be passing major life milestones from which Mr. Castro will necessarily be excluded. The man who regularly showed up at 6:30 in the morning to get his own children ready for school will never be able to do the same for his grandchildren. As the Second Circuit has recognized, "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence[.]" *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009). The "collateral effects" of the sentence in this case in many ways overshadow the prison sentence to be imposed, and a properly calibrated sentence must recognize that reality.

**The Court Should Account for Mr. Castro's Age in Fashioning a Sentence.**

If the Court imposes the mandatory minimum sentence in this case, Mr. Castro will be in his 60s by the time he leaves BOP custody. Though Mr. Castro is fortunate enough to be in fairly good health now, that condition cannot be expected to last in prison. As a 2013 statistical analysis based on ten years' worth of data from New York State parolees has shown, "for each year served in prison, a person could expect to lose approximately 2 years of life."[4]

---

[4] Evelyn J. Patterson, *The Dose–Response of Time Served in Prison on Mortality: New York State, 1989–2003*, American J. of Pub. Health 523, 526 (2013). Available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3673515/pdf/AJPH.2012.301148.pdf.

Reflecting the reality that growing old in prison is not the same as aging in the community, the Bureau of Prisons defines the special population of "aging" inmates as anyone over 50.[5] Mr. Castro passed that mark years ago. As he ages, he is increasingly going to need assistance and medical treatment. Unfortunately, as the United States Department of Justice itself has recently outlined in a report by the Office of the Inspector General, federal prisons are ill-suited to this caregiving role. The report made the following key findings:

- "Aging inmates are more costly to incarcerate, primarily due to their medical needs."
- "BOP [Bureau of Prisons] institutions lack appropriate staffing levels to address the needs of an aging inmate population and provide limited training for this purpose."
- "The physical infrastructure of BOP institutions cannot adequately house aging inmates."
- "The BOP does not provide programming opportunities specifically addressing the needs of aging inmates."
- "Aging inmates commit less misconduct while incarcerated and have a lower rate of re-arrest once released." *Id*.

These collected observations highlight the inadequacy of federal prisons to the task of appropriately housing and caring for a population of inmates over the age of 50. For this reason, the BOP itself acknowledges that incarceration may become inappropriate for at least some portion of the aging prison population. So too, does the Sentencing Commission. As USSG § 5H1.1 acknowledges, "Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration."

---

[5] United States Department of Justice Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (May 2015) at i. Available at https://oig.justice.gov/reports/2015/e1505.pdf.

13

While Mr. Castro is not elderly, he is old enough that his age will make any prison sentence harsher than it would be for a younger person. A sentence that keeps Mr. Castro incarcerated well into his 60s will likely impose ever greater physical difficulties on him as he ages.

## CONCLUSION

For the reasons above, Defendant respectfully requests that the Court impose a 10-year sentence in this matter and that the Court recommend Mr. Castro serve his sentence at the minimum security camp at FCI Pekin so that he may be near his family.

Respectfully submitted,

THE DEFENDANT,
Arturo Castro

OFFICE OF THE FEDERAL DEFENDER

Dated: August 21, 2017

/s/ James P. Maguire
James P. Maguire
Assistant Federal Defender
265 Church Street, Suite 702
New Haven, CT 06510
Phone: (203) 498-4200
Bar No.: ct29355
Email: James_Maguire@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 21, 2017, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ James P. Maguire
James P. Maguire